

*JUDGE SCHEINDLIN*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BRIAN COSTIGAN, on behalf of himself and all others similarly situated, | : : : | |
| | : | Civ. No.: |
| Plaintiff, | : : | **PLAINTIFF DEMANDS** |
| v. | : : | **A TRIAL BY JURY** |
| CITIGROUP Inc. and CITIMORTGAGE, INC., | : : | |
| Defendants. | : : | |

RECEIVED
NOV 19 2010
U.S.D.C. S.D. N.Y.
COMPLETED

## CLASS ACTION COMPLAINT

1.    This is a putative class action on behalf of the plaintiff and a class of all others similarly situated against CitiGroup, Inc. and CitiMortgage, Inc. (together, "Defendants" or "Citi").   The plaintiff, Brian Costigan ("Plaintiff"), individually and on behalf of all others similarly situated, alleges as follows upon personal knowledge as to his actions and upon information and belief based upon investigation of his attorneys as to all other facts alleged in the Class Action Complaint.

## PARTIES

2.    Plaintiff Brian Costigan resides at 423 Boesel Avenue, Manville, New Jersey.

3.    Defendant CitiGroup, Inc. Delaware corporation headquartered at 399 Park Avenue, New York, New York, 10043. Citi originates and services residential mortgages throughout the United States.

4.      Defendant CitiMortgage,, Inc. is a member of CitiGroup, Inc., and services Citi mortgages. CitiMortgage is incorporated in Florida and headquartered at 1000 Technology Drive, Mailstop 730, O'Fallon, Missouri 63368.

## JURISDICTION AND VENUE

5.      This is a proposed nationwide class action.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the Plaintiff and Defendants are of diverse citizenship and the matter in controversy exceeds seventy-five thousand dollars ($75,000.00) exclusive of interest and costs; and pursuant to 28 U.S.C. § 1332(d)(2), because the Plaintiff and the vast majority of the putative class (each individual member a "Class Member" and collectively the "Class Members") are of diverse citizenship from the Defendants and the aggregate amount in controversy exceeds five million dollars ($5,000,000.00) exclusive of interest and costs.

6.      Venue is proper in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here and Defendants regularly transact business in this District and are subject to personal jurisdiction in this District.

## FACTUAL BACKGROUND

### Troubled Asset Relief Program

7.      On October 3, 2008, the Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, 122 Stat. 3765 (codified as amended at 12 U.S.C. §§ 5201-5261, 31 U.S.C. §1105, and scattered sections of 26 U.S.C.), (the "EESA") became law.  Developed in response to the financial crisis facing the nation, EESA provided immediate authority and facilities that the United States Department of the Treasury could use to restore liquidity and stability to the financial system.  In this regard, EESA authorized the Secretary of the Treasury to establish the

Troubled Asset Relief Program ("TARP") to "purchase, and to make and fund commitments to purchase, troubled assets from any financial institution, on such terms and conditions as are determined by the Secretary, and in accordance with this Act and policies and procedures developed and published by the Secretary."

8.     Citi received $45 billion in federal funds under the TARP program.

9.     As part of the TARP program, the Department of the Treasury introduced the Home Affordable Modification Program ("HAMP"), which provides guidelines for mortgage services to adopt to modify loans for homeowners in financial need.

10.     Citi signed the Servicer Participation Agreement for HAMP in mid-April 2009.

11.     HAMP is a shared debt reduction program between the lender and the government. Initially the lender reduces the homeowner's monthly mortgage payments to reflect no more than 31% of their gross income. Thereafter, the Treasury Department steps in and offers financial incentives to the lender.

12.     The benefit to the homeowner is a reduction in monthly mortgage payments.

13.     In order to encourage lenders and banks to take part in the program, the lender also receives various financial benefits.

14.     Both the homeowner and mortgage itself must qualify to participate in HAMP.

15.     The HAMP protocol starts with homeowners providing the lender with required documentation and information. The lender must determine 31% of the homeowner's gross income and must then follow a three-step process to reduce the monthly payment to that 31% amount. The lender may reduce the interest rate to as low as 2%, extend the loan terms up to 40 years, and finally defer a portion of the principal if necessary until the loan is paid off.

16.     The first step in the loan modification approval process is for the homeowner to take part in a 90-day trial period based upon the new loan modification monthly payment. The borrower must remain current for the first three months or 90-day period.  If the borrower's total monthly debt exceeds 55% of their gross income, the lender or bank must notify the borrower in writing of HUD approved credit counselors. The borrower must complete a credit counseling program and obtain a certificate.  If the homeowner's debt does not rise to the 55% level, the foregoing is not required.

17.     The lender must waive any late fees upon completion of the 90-day trial period if the borrower successfully completes the trial.

18.     Subsequent to a modification agreement being entered into by the homeowner and the lender, any foreclosure action will be temporarily suspended during the 90-day trial period. In the event that the HAMP or alternative foreclosure prevention options fail, the foreclosure action may be resumed. However, pursuant to HAMP, should the modification fail, banks and lenders are required to consider other programs before foreclosure, including but not limited to short sales and deed in lieu of debt.

### Slipshod Practices Take Hold at Citi
### With Respect to Documentation and Processing Foreclosures

19.     Defendants owe a duty of good faith and fair dealing with respect to their borrowers, including Plaintiff and Class Members.

20.     As a result of the economic crisis and ongoing high unemployment rates, Citi had to deal with an unprecedented number of foreclosures.[1]

---

[1] According to LPS Applied Analytics, a mortgage data firm, 2 million households are now in foreclosure and another 2.37 million households are seriously delinquent and waiting for their lenders to take action.

21.     Note holders and mortgage holders have the right to collect amounts due under a delinquent note and mortgage.  However, they have the duty and responsibility, and indeed have contracted, to do so within the confines of the law and the judicial foreclosure process.

22.     In part because it was overwhelmed by the number of defaults foreclosures that have had to be processed, slipshod practices took hold at Citi, notwithstanding its statutory obligations under various statutory schemes, including N.Y.R.P.A.P.L. §1300 *et seq*[2] and/or the and/or the New Jersey Fair Foreclosure Act ("FFA"), N.J. Stat. Ann. 2A:50-53 *et seq.*[3]

23.     Citi engaged in a course of fraudulent and unconscionable conduct with respect to its borrowers in connection with foreclosure procedures in order to accelerate the foreclosure process to obtain title over foreclosed property through unlawful means.

---

[2] Judicial foreclosure is the process almost universally used in New York. The lender must sue the borrower in court and obtain a judgment of foreclosure.

- To begin the process a summons and complaint is filed along with a lis pendens. The borrower has 20 days in which to appear in court to answer. If no action is taken by the borrower, the lender will move for a summary judgment.
- If granted, the court will appoint a referee who will determine the amount owed and how the property shall be sold. The referee files his report with the court. The court confirms the report and enters a judgment of sale. This stage of the process may take from 12-18 months.
- The notice of sale is published weekly for four to six weeks. The sheriff or referee may conduct the sale at the time and place designated in the notice of sale.
- The officer conducting the sale will execute a deed to the successful bidder when the sale is complete. The successful bidder must deposit 10% of the bid price at the time of sale, and close with the balance due within 30 days. The officer shall then submit a report of sale to the court for confirmation. The lender may bid the total amount due. If no one else bids, the property reverts to the lender.
- A motion for a deficiency judgment, if applicable, must be filed with the court within 90 days of the date of sale. The court will determine the market value of the property and award the greater of market value or auction price to the lender.

[3] The FFA is a comprehensive statutory scheme that establishes uniform sheriff's sale procedures to be used in all mortgage foreclosure actions in New Jersey, a uniform sheriff's deed, an optional or strict mortgage foreclosure procedure without sale, as well as other provisions. Among other things, the FFA gives the residential mortgage debtor the right to cure the mortgage default prior to final judgment in a conventional mortgage foreclosure action with sale, and prior to the redemption order in the optional or strict mortgage foreclosure procedure without sale.

24.    Motivated by speed and profits rather than obligatory attention to detail, Citi failed to record necessary documents to legally foreclose.

25.    To remedy the deficiencies in documentation and efficiency, Citi engaged in a systematic scheme of fabricating evidence in the form of fraudulent pleadings, affidavits and other documents that were used in foreclosure proceedings against homeowners.

26.    Citi employees issued fraudulent affidavits which purportedly proved Citi's control of a mortgage and, if necessary, outsourced tasks to outside entities without adequate oversight.  As a result, Citi and its agents failed to verify amounts borrowed and to determine which institutions had a right to foreclose prior to filling these fraudulent affidavits.

27.    Citi "robo-signers" signed affidavits so quickly that Citi could not possibly have verified the information in the documents being reviewed.  Document signers did not review the affidavits to determine whether all exhibits cited in the affidavit are attached to the affidavit, and Citi employees failed to verify the accuracy of the contents of the affidavits before the document signer executed the affidavit.  The affidavits were not actually executed on personal knowledge of the document signer.

28.    It is unlawful for the affiant to assume the facts contained in a draft affidavit are accurate without any independent knowledge, research, or verification, and then swear to having personal knowledge of the accuracy of those facts.

29.    Citi has routinely disregarded procedural safeguards provided to borrowers and has failed to properly review documentation submitted or relied upon in connection with foreclosure proceedings.

30.    Defective documentation is routinely sent to Citi foreclosure attorneys for use in judicial foreclosure proceedings.

31.    Citi engaged in this misconduct despite the fact that it knew that these policies were improper, sanctionable, and unlawful.

32.    Citi breached its obligations to Plaintiff and Class Members by misrepresenting and/or failing to disclose the nature and scope of its egregious loan processing errors to Plaintiff and Class Members.

33.    As a result of its systematic failure to properly document and process paperwork, Citi has wrongfully foreclosed on thousands of properties throughout the United States.

34.    Citi engaged in a pattern and practice of failing to review borrowers' documentation until several months after the initial institution of foreclosure proceedings.

35.    Citi has initiated foreclosure proceedings on mortgages without holding the necessary rights as the mortgagee or assignee at the time of foreclosure, thereby forcing Class Members to defend against illegitimate lawsuits.

36.    Citi has initiated foreclosure proceedings on mortgages even when the mortgagor was not in default, thereby forcing Class Members to defend against illegitimate lawsuits.

37.    The misconduct described above is the standard practice, policy and procedure of Defendants.

38.    Defendants have engaged in a systematic effort to employ the legal process to further their abusive, fraudulent, unfair, and deceptive goal of obtaining title to property through fabricated and fraudulent statements and legal documents that are not properly notarized, in violation of law.

39.    Defendants had intent and knowledge prior to filing, as well as during and after, a foreclosure proceeding, that Defendants would be submitting fraudulent affidavits and other unlawful documents to wrongfully obtain title to a foreclosed property.  In other words, Citi